**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**GENDRI ORTIZ PAREDES,**

                                        **Petitioner,**

   **vs.**                                        **9:26-CV-324**
                                                 **(MAD)**

**KENNETH GENALO, TODD LYONS, MARKWAYNE**
**MULLIN, TODD BLANCHE, and WARDEN,**

                                        **Respondents.**

---

**APPEARANCES:**                          **OF COUNSEL:**

**LAW FIRM OF UGO C. UGEH, P.C.**          **UGO C. UGEH, ESQ.**
8900 Sutphin Blvd. - Suite 204
Jamaica, New York 11435
Attorney for Petitioner

**OFFICE OF THE UNITED**                   **KAREN F. LESPERANCE, AUSA**
**STATES ATTORNEY**
James T. Foley U.S. Courthouse
445 Broadway, Room 218
Albany, New York 12207
Attorney for Respondents

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On February 27, 2026, Petitioner Gendri Ortiz Paredes filed a petition for habeas corpus

seeking relief from his detention by the Department of Homeland Security's ("DHS") Immigration

and Customs Enforcement Office ("ICE"). *See* Dkt. No. 1. Petitioner names the following

individuals as Respondents: Kenneth Genalo, New York City Director for Enforcement &

Removal Operations for Immigration and Customs Enforcement; Todd Lyons, Acting ICE

Director; Markwayne Mullin, DHS Secretary; Todd Blanche, Acting Attorney General of the U.S. Department of Justice; and the Warden of the Broome County Detention Facility. *See id.*[1]

Petitioner has been detained by ICE since October 25, 2025, and requests immediate release, or an order requiring Respondents to hold a bond hearing pursuant to 8 U.S.C. § 1226(a) with the Government bearing the burden of proof. *See id.* Respondents oppose the Petition. *See* Dkt. No. 5. Petitioner filed a reply. *See* Dkt. No. 9. The Court held a hearing on April 20, 2026.

For the following reasons, the Petition is denied in part and granted in part.

## II. BACKGROUND

### A. Factual and Procedural Background

The factual and procedural background are derived from the parties' filings, including the immigration administrative record attached to Respondents' memorandum of law, as well as counsels' representations during the hearing.

Petitioner is a native and citizen of Guatemala who entered the United States on March 9, 2024, at which time he was 17 years old. *See* Dkt. No. 5-2 at 8, 13.[2] He was processed by immigration officials as an Unaccompanied Alien Child, and served with a Form I-862 Notice to Appear and the Form I-200 Warrant for Arrest of Alien, which designated him as "as an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General. " *Id.* at 1. Petitioner was

---

[1] Under Federal Rule of Civil Procedure 25(d), when an officer ceases to hold office while the action is pending, the officer's successor is automatically substituted as a respondent. Accordingly, Markwayne Mullin is hereby substituted for Respondent Kristi Noem. Attorney General Pamela Bondi's successor will be automatically substituted as a Respondent once a new Attorney Generally officially replaces her. At the present time, Acting Attorney General Todd Blanche is substituted for Respondent Pamela Bondi.

[2] Citations are to the pagination generated by the Court's electronic filing system, CM/ECF, in the header of each page.

transferred to the custody of the U.S. Department of Health and Human Services' Office of Refugee Resettlement who released him on his own recognizance to the custody of his mother in Roosevelt, New York, on March 29, 2024. *See* Dkt. No. 5 at 6; Dkt. No. 5-2 at 28.

DHS issued Petitioner a second Notice to Appear on September 12, 2024, which was filed with the immigration court. *See* Dkt. No. 5 at 6; Dkt. No. 5-2 at 19. On November 13, 2024, Petitioner filed a Form I-589, Application for Asylum and for Withholding of Removal. *See* Dkt. No. 5-1 at ¶ 8. On October 24, 2025, Petitioner filed a Form I-360, Petition for Special Immigrant Juvenile. *See* Dkt. No. 1 at 12; Dkt. No. 5-1 at ¶ 8. According to Petitioner's attorney, Petitioner appeared at every immigration court and family court proceeding. It was not made clear to the Court what action is pending in family court. However, the Special Immigrant Juvenile application was received by United States Citizenship and Immigration Services ("USCIS") and remains pending. *See* Dkt. No. 1 at 12.

On October 25, 2025, Petitioner was arrested by the Nassau County Police Department on three counts of petit larceny, for three separate shoplifting incidents that occurred at Dick's Sporting Goods in Garden City, New York. *See* Dkt. No. 5-1 at ¶ 9; Dkt. No. 5-2 at 32-38. Those incidents are alleged to have occurred on August 6, October 20, and October 25, 2025. *See* Dkt. No. 5-2 a 32-38. The Police Department contacted ICE, and ICE confirmed Petitioner's immigration status. *See* Dkt. No. 5-1 at ¶ 10. DHS executed and served on Petitioner a Form I-200, Warrant for Arrest of Alien, and Petitioner was transferred to ICE custody the same day as his arrest. *See id.*; *see also* Dkt. No. 5-2 at 22. "ICE's Enforcement and Removal Operations New York City Field Office made an Initial Custody Determination that Petitioner was to be detained, as he was not subject to INA § 236(a)." Dkt. No. 5 at 6; *see also* Dkt. No. 5-22 at 22.

On October 26, 2025, Petitioner was transferred to Broome County Jail. *See* Dkt. No. 5-1 at ¶ 11.

According to Petitioner, on November 14, 2025, DHS filed a motion to pretermit Petitioner's "pending applications based on the United States government's [Asylum Cooperative Agreement] with Honduras." Dkt. No. 1 at 3. DHS "urged the [immigration c]ourt to pretermit [Petitioner's] relief applications and order him removed to Honduras, a country where he has no ties whatsoever." *Id.* Petitioner's counsel opposed DHS' motion, but "the Immigration Judge entered an order granting the DHS' motion to pretermit on December 29, 2025." *Id.* Petitioner appealed the Immigration Judge's decision on January 14, 2026. *See id.* That appeal is currently pending. *See id.* Petitioner contends "[t]he general timeframe for a decision from the Board of Immigration Appeals is between 6-18 months." *Id.* Petitioner attached the December 29, 2025, Order of the Immigration Judge which is "a summary of the oral decision," but did not attach a transcript of the oral decision. Dkt. No. 1 at 19. The summary does not state why Petitioner's applications were pretermitted. *See id.* Petitioner contends the Immigration Judge ignored his application for Special Immigrant Juvenile status and "the only obstacle to [Petitioner] continuing with that petition is the illegal arrest and detention conducted by the Nassau County Police . . . ." *Id.* at 3.

Petitioner filed the currently pending habeas petition on February 27, 2026. *See* Dkt. No. 1. According to Respondents, "[o]n or about March 3, 2026, ICE referred Petitioner to . . . USCIS . . . for potential adjudication of the Form I-589 he filed with USCIS due to his potential status as a *J.O.P v. DHS* class member." Dkt. No. 5 at 6.

During the hearing before this Court, counsel for Respondents stated she was unaware if Petitioner had been given a hearing prior to the pretermission of his asylum application.

However, she explained that ICE determined Petitioner was a member of *J.O.P.* class action; therefore, his asylum application had been referred to USCIS for an independent determination. The parties agree that USCIS's review of Petitioner's asylum application remains pending.

**B.      Immigration Landscape**

To provide appropriate context for the decision herein, the Court will outline some of the terminology and concepts referenced in the parties' briefs.

**1.  *Asylum Cooperative Agreements***

"In November 2019, the Departments of Homeland Security and Justice published an interim final rule announcing that the U.S. government had entered into 'asylum cooperative agreements' . . ., [which are] *de facto* [safe third country agreements], with Guatemala, El Salvador, and Honduras." *U.S. safe third-country provisions*, Law of Asylum in the United States § 6:45 (2025 ed.).  Under a safe third country agreement, a person cannot apply for asylum if that individual "can be removed to a country where (1) their 'life or freedom would not be threatened' on account of one of the five protected grounds and (2) there is 'access to a full and fair procedure for determining a claim to asylum or equivalent temporary protection.'" *Id.* (quoting INA §§ 208(a)(2)(A), 241(b)(3); 8 U.S.C. §§ 1231(b)(3), 1158(a)(2)(A)).  "The proposed country of removal cannot be the applicant's country of nationality or last habitual residence." *Id.*

Under asylum cooperative agreements, "[w]ith certain exceptions, persons subject to these agreements were ineligible to apply for asylum, withholding of removal, or protection under the Convention Against Torture." *Id.*  "The United States could remove people seeking humanitarian protection to one of the three countries, which, notably, are all themselves among the world's leading countries of origin for asylum seekers." *Id.* (citing *Implementing Bilateral and Multilateral Asylum Cooperative Agreements Under the Immigration and Nationality Act*, 84

FED. REG. 63994, 63994 (Nov. 19, 2019)).  "The United Nations High Commissioner on Refugees . . . immediately criticized the new policy, stating that 'it is an approach at variance with international law that could result in the transfer of highly vulnerable individuals to countries where they may face life-threatening dangers.'"  *Id.* (quoting United Nations High Commissioner on Refugees, *Statement on New U.S. Asylum Policy*, available at https://www.unhcr.org/en-us/news/press/2019/11/5dd426824/statement-on-new-us-asylum-policy.html [perma.cc/YF24-977A]).  However, a "'safe third country' is theoretically equipped to review the refugee's asylum application, provide a robust asylum application process, and grant asylum (or its equivalent) in meritorious cases."  Thomas Michael McDonnell, *Unsafe at Any Speed: "Safe Third Country Agreements"-Offshoring and Eroding Legal Protections Owed to Refugees and Asylum Seekers*, 53 FORDHAM URB. L.J. 17, 23 (2025).  "The transferring state theoretically also assumes that the 'safe third country' complies with international human rights treaties, related customary international law, and . . . the principal multilateral treaties with worldwide reach guaranteeing refugee rights."  *Id.*

Most simply put, 8 U.S.C. § 1158 states that the provision granting an undocumented individual the right to "apply for asylum" "shall not apply" "if the Attorney General determines that the alien may be removed, pursuant to" an asylum cooperative agreement.  According to Petitioner, his asylum application was pretermitted because he was ordered removed to Honduras under an asylum cooperative agreement.  *See* Dkt. No. 1 at 3.  Respondents did not address the reason for the pretermission of Petitioner's asylum application in their response.  *See* Dkt. No. 5.

### 2. *Pretermission of Applications*

Pretermit means "[t]o ignore or disregard purposely."  Black's Law Dictionary (12th ed. 2024).  "In essence, the asylum adjudicator completely bypasses a determination of statutory

eligibility by deciding, in advance, that the applicant is ineligible." Robert G. Rooney, *The Power to Pretermit an Application for Asylum: Improper Policy for American Asylum Law*, 5 GEO. IMMIGR. L.J. 641, 675, n.27 (1991) ) (quoting Black's Law Dictionary 619 (5th ed. 1983)). The Department of Justice issued a Policy Memorandum on pretermission in 2025, stating that "[a]liens in removal proceedings have the burden of demonstrating eligibility for any type of relief or protection from removal. 8 U.S.C. 1229a(C)(4); 8 C.F.R. § 1240.8(d). If an alien fails to set forth prima facie eligibility for relief, such application generally can be pretermitted." Sirce E. Owen, *Pretermission of Legally Insufficient Applications for Asylum*, Department of Justice Executive Office of Immigration Review, https://www.justice.gov/eoir/media/1396411/dl?inline (last visited Mar. 19, 2026). The Memorandum states that it was the opinion of the Executive Office of Immigration Review, through its "interpretation of applicable law[,] that adjudicators may pretermit legally deficient asylum applications without a hearing." *Id.*

The Second Circuit has previously affirmed immigration judges' decisions to pretermit asylum applications in various unpublished decisions. *See, e.g.*, *Xiaolin Chen v. Whitaker*, 759 Fed. Appx. 86 (2d Cir. 2019) (summary order); *Changjian Chen v. Lynch*, 618 Fed. Appx. 708, 712 (2d Cir. 2015) (summary order); *Sanogo v. Holder*, 573 Fed. Appx. 73, 77 (2d Cir. 2014) (summary order).

The Court notes that, in the District of Utah, there is currently a pending complaint filed by a Venezuelan citizen which "seeks to represent a nationwide class of noncitizens whose applications for asylum and related protection have been or will be pretermitted under the [asylum cooperative agreements], and to add appropriate agency officials in their official capacities to

ensure complete and effective injunctive relief." *Arguello v. Neom*,[3] No. 2:25-CV-00786, 2026 WL 734479, *1 (D. Utah Mar. 16, 2026).

### 3. *Special Immigrant Juvenile and J.O.P v. DHS*

"A child may be granted lawful permanent residency in the United States without first obtaining a visa if he or she is found eligible for special immigrant juvenile status under 8 U.S.C.A. § 1101(a)(27)(J)." *Eligibility for Special Immigrant Juvenile Status Under 8 U.S.C. § 1101(a)(27)(J) and 8 C.F.R. § 204.11*, 67 A.L.R. Fed. 2d 299 (Originally published in 2012). "To be eligible for such status, a person must be under 21 years of age, unmarried, and declared dependent upon a court or legally committed to, or placed under the custody of, a state agency, individual, or entity appointed by a state court." *Id.* "Additionally, a court must find that reunification with one or both of the child's parents is not viable due to parental abuse, neglect, abandonment, or similar misconduct defined under state law, and that it would not be in the child's best interest to be returned to his or her native country." *Id.*

"Under the [William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008], unaccompanied alien children who have been issued a notice to appear will file their initial application for asylum with USCIS' Asylum Office." *When and where to apply for asylum—Applying in a removal proceeding*, 1 IMMIGR. LAW AND DEFENSE § 13:48. "This 'initial jurisdiction' also applies if the child had a pending asylum claim in immigration court, on appeal to the [Board of Immigration Appeals], or in federal court." *Id.* In 2013, "USCIS adopted . . . [a] new policy, in cases in which [U.S. Customs and Border Patrol] or ICE had already determined that an applicant was a UAC and that determination 'was still in place on the date the asylum application was filed,' USCIS would adopt that determination without another factual inquiry."

---

[3] This is the spelling of the previous DHS Secretary's name on the Utah case's docket.

*J.O.P. v. U.S. Dep't of Homeland Sec.*, 338 F.R.D. 33, 44 (D. Md. 2020). "Six years later, on June 14, 2019, USCIS published on its website the memorandum at issue in [J.O.P.], which revised the procedures established in [] 2013." *Id.* "The 2019 Redetermination Memo explained that in that [Board of Immigration Appeals] decision, *Matter of M-A-C-O-*, 27 I. & N. Dec. 477 (BIA 2018) . . ., the [Board of Immigration Appeals] concluded that [Immigration Judges] have jurisdiction to determine whether an individual previously determined to be a UAC, but who turned 18 years old before filing an asylum application, no longer qualifies as a UAC." *Id.* The Memorandum indicated that "[i]f [the Executive Office of Immigration Review] has explicitly determined that USCIS does not have jurisdiction over an asylum application because it is not one filed by a UAC, the asylum officer will defer to that determination." *Id.*

On July 1, 2019, "a group of undocumented immigrants who entered the United States as unaccompanied children, on behalf of themselves and a class of all others similarly situated," brought a legal action against DHS and "several of its officials and components" "alleging that a change in [the Government's] policy with respect to asylum applications filed by unaccompanied alien children violated the [Administrative Procedures Act] and the Due Process Clause of the Fifth Amendment of the U.S. Constitution." *J.O.P.*, 338 F.R.D. at 40 (footnote omitted). "On Dec. 21, 2020, the District Court for the District of Maryland certified a class and entered an Amended Preliminary Injunction in the case of J.*O.P. v. U.S. Dept. of Homeland Security et al.*, Civil Action 8:19-cv-01944." U.S. Citizenship and Immigration Services, *J.O.P. v. U.S. Dept. of Homeland Security, et. al., Information*, https://www.uscis.gov/laws-and-policy/other-resources/class-action-settlement-notices-and-agreements/jop-v-us-dept-of-homeland-security-et-al-information (last visited April 20, 2026). "The Amended Preliminary Injunction enjoined USCIS from deferring to [Executive Office of Immigration Review] determinations in assessing

9

jurisdiction over asylum applications filed by [Unaccompanied Alien Child] in removal proceedings." *Id.* "In accordance with the court's order, [USCIS is] reviewing all asylum applications where [it] determined that [it] did not have jurisdiction under the 2019 [Unaccompanied Alien Child] memorandum or deferred to an [Executive Office of Immigration Review] assessment of jurisdiction. Applicants will receive a Notice of Re-Examination of Jurisdictional Determination if [it] declined to accept jurisdiction over their asylum application for one of these reasons." *Id.*

According to Respondents, Petitioner is a member of the *J.O.P.* class and his asylum application has been referred to USCIS for re-examination.

### III. DISCUSSION

Petitioner was processed by immigration officials as an Unaccompanied Alien Child in 2024 and was detained by ICE following an arrest by local police for alleged criminal conduct in October 2025. Petitioner's asylum application was pretermitted and his appeal from that decision is pending. His Special Immigrant Juvenile application is also pending. Petitioner was ordered removed and, based on the United States' asylum cooperative agreement with Honduras, he was ordered removed to Honduras or, in the alternative, to Guatemala. Petitioner's asylum application is being newly considered by USCIS pursuant to the *J.O.P.* class action settlement. To date, Petitioner has not been afforded a bond hearing. Based on the factual and legal landscape as described above and below, Petitioner's initial detention by ICE was mandatory, but constitutional due process requires the Government to provide him with a bond hearing.

**A.     Whether Petitioner's Detention Was Mandatory Pursuant to 8 U.S.C. § 1226(c)**

Pursuant to § 1226(a), "the Attorney General" "may release the alien on" (1) "bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney

General" or (2) "conditional parole."  8 U.S.C. § 1226(a)(2).   However, "[i]n 2025, Congress enacted, and the President signed into law the Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025)."  *Lira Caceres v. Shanahan*, No. 26-CV-16, 2026 WL 233215, at *7 (E.D.N.Y. Jan. 28, 2026).  "The Laken Riley Act made detention mandatory for certain [] aliens who are deemed 'inadmissible' under particular statutes and are 'charged' with, 'arrested for,' 'convicted of,' or 'admit[ ]' to specific offenses, including ' . . . theft, larceny, [or] shoplifting . . . .'"  *Id.* (quoting 8 U.S.C. § 1226(c)(1)(E)(ii)); *see also Weng v. Genalo*, No. 25-CV-9595, 2026 WL 194248, *5 (S.D.N.Y. Jan. 25, 2026) (citing *Cabanas v. Bondi*, No. 25-CV-4830, 2025 WL 3171331, *6 (S.D. Tex. Nov. 13, 2025).  Subsection (a), which permits an alien to be released on bond, expressly exempts "subsection (c)."  *Id.*  Subsection (c) is the provision which mandates detention when an alien is arrested for or charged with an enumerated criminal offense.  Pursuant to subsection (c)(4), "[t]he Attorney General may release an alien described in paragraph (1) [of subsection (c)] only if the Attorney General decides" that the alien falls under a specific witness protection requirement.  8 U.S.C. § 1226(c)(4); *see Chen v. Almodovar*, No. 25-CV-9670, 2026 WL 100761, *4 (S.D.N.Y. Jan. 14, 2026) ("[T]hose excepted from Section 1226(a) under Section 1226(c)—including under the Laken Riley Act—remain subject to full removal proceedings but must be detained, absent a narrow need for release for witness-protection purposes").

Based on this statutory framework, it is Respondents' position that Petitioner's detention was mandatory.  *See* Dkt. No. 5 at 7-10.  Petitioner argues his arrest was unlawful, so the Laken Riley Act does not mandate detention.  *See* Dkt. Nos. 1, 9.

The Court agrees with Respondents.  The plain language of § 1226(c) states that if an alien is inadmissible—a finding Petitioner does not contest—and has been arrested for, or charged with, theft, larceny, or shoplifting, he "shall" be taken into custody.  8 U.S.C. § 1226(c)(E)(ii).

Petitioner summarily argues that his arrest was unlawful. *See* Dkt. No. 1. In his reply and during the hearing, Petitioner's attorney asserted he had never seen any charging documents concerning criminal charges against his client. *See* Dkt. No. 9 at 7.

Respondents provided the Court with a Notice to Appear, an Information, and three supporting depositions from Nassau County which reflects that Petitioner was arrested for three separate petit larcenies on October 25, 2025. *See* Dkt. No. 5-2 at 32-38. Those documents were filed on the Court's docket. *See id.* Petitioner has not provided a single reason as to why the Court should doubt the veracity of those documents or the assertion that he was arrested for the alleged crimes. Insofar as it appears Petitioner has not yet been arraigned on the charges, § 1226(c) mandates detention for someone "arrested for" the enumerated crimes. 8 U.S.C. § 1226(c)(E)(ii). Theft, larceny, and shoplifting are three of the enumerated crimes. *See id.* Petitioner was arrested for petit larceny. Therefore, his initial detention was mandatory.

Petitioner does not contend that he falls under the witness protection provision of § 1226(c)(4), which would permit his release. Therefore, pursuant to a plain reading of § 1226, Petitioner's detention was mandatory under subsection (c), the Government was not required to provide him with an initial bond hearing, and he is statutorily exempted from being considered for bond under subsection (a).

**B.    Whether a Bond Hearing is Required**

Petitioner contends that constitutional due process mandates his immediate release or a bond hearing. *See* Dkt. Nos. 1, 9. Respondents argue the Court should stop at the plain reading of the statute and hold that Petitioner is not entitled to a bond hearing because § 1226(c) mandates his detention. *See* Dkt. No. 7.

The Second Circuit squarely addressed this issue in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024).  The Second Circuit acknowledged that "[u]nder section 1226(c) . . . noncitizens who have committed one of certain listed offenses or who have been identified by the government as involved in terrorist activities are subject to mandatory detention."  *Black*, 103 F.4th at 140-41 (citing 8 U.S.C. § 1226(c)(1)(A)-(D)).  "[T]his subsection specifies that the 'Attorney General *shall* take into custody' any such noncitizen."  *Id.* (citation and footnote omitted).  "It addresses and allows release in extremely limited circumstances: 'only if the Attorney General decides ... that release of the alien from custody is necessary for [witness protection purposes].'"  *Id.* (quoting 8 U.S.C. § 1226(c)(1)-(2)).

The Second Circuit discussed the Supreme Court's decision in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), in which "[t]he Supreme Court . . . ruled that section 1226(c) itself authorizes prolonged detention.  Indeed, [the Supreme Court] construed the statute, together with section 1226(a), to provide that detention '*must* continue "pending a decision on whether the alien is to be removed from the United States."'"  *Black*, 103 F.4th at 141-42 (quoting *Jennings*, 583 U.S. at 303).  The Second Circuit in *Black* agreed that "the text of section 1226(c) does not require a bond hearing after some predetermined period of detention[.]"  *Id.* at 142.  The Second Circuit summarized Supreme Court's precedent as "instruct[ing that] (1) due process does not require an initial bond determination for those detained under section 1226(c), and (2) section 1226's text cannot be construed to require a bond hearing after any particular fixed period of detention."  *Id.*  "Critically, however, [the Supreme Court's recent decisions] le[ft] open the question whether prolonged detention under section 1226(c) without a bond hearing will *at some point* violate an individual detainee's due process rights."  *Id.*  The Supreme Court "also d[id] not teach what procedures due process may require, and whether due process principles (as opposed to section

1226(c)'s terms) may properly be understood to call for a bright-line rule as to timing or in any other respect." *Id.*

The Second Circuit answered the question of whether "prolonged detention under section 1226(c) without a bond hearing will *at some point* violate an individual detainee's due process rights" in the affirmative. *Id.* The Second Circuit held that "[t]he Constitution does not permit the Executive to detain a noncitizen for an unreasonably prolonged period under section 1226(c) without a bond hearing; at some point, additional procedural protections—like a bond hearing—become necessary." *Id.* at 145. The Second Circuit proceeded to "conclude that due process challenges to prolonged detention under section 1226(c) should [] be reviewed under *Mathews*." *Black*, 103 F.4th at 147; *see also Mathews v. Eldridge*, 424 U.S. 319 (1976).

During the hearing before this Court, counsel for Respondents conceded that this Court is bound by Second Circuit precedent; therefore, although the Government disagrees with the Second Circuit's decision, it admits that *Black* is binding and requires this Court to apply the *Mathews v. Eldridge* balancing test to determine whether and when Petitioner's detention under § 1226(c) violates his due process rights. Counsel advised the Court that the Government has petitioned the Supreme Court for a writ of certiorari in *Black*. *See Genalo v. Black*, No. 25-886, U.S. Supreme Court (Petition filed 01/22/2026).

The Court also acknowledges that one circuit court has expressly disagreed with the *Black* decision. In *Banyee v. Garland*, 115 F.4th 928 (8th Cir. 2024), the court reversed the judgment of the district court and remanded for denial of the habeas petition, holding that the petitioner's year-long detention pending his appeal of an immigration decision did not violate due process. The Eighth Circuit noted that in applying § 1226(c), "[w]hat is important is that, notwithstanding the delay, deportation remains a possibility." *Banyee*, 115 F.4th at 933. The court noted that the

14

petitioner "after all, is appealing an order that *requires* his removal, which in this case is to Ivory Coast, where he was born and remains a citizen. " *Id.* at 934.  The Eighth Circuit declined to engage in "a form of interest balancing." *Id.* at 933.

On the other hand, the Third Circuit has come to the same conclusion as that reached in *Black*, stating as follows: "[I]mmigrants detained under § 1226(c) may bring as-applied challenges to the constitutionality of their detentions. . . .  The longer they are detained without bond hearings, the more likely their detention abridges the liberty secured by the Due Process Clause. . . .  'When detention becomes unreasonable, the Due Process Clause demands a hearing.'" *Michelin v. Warden Moshannon Valley Corr. Ctr.*, 169 F.4th 418, 433 (3d Cir. 2026) (quoting *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 209 (3d Cir. 2020)).

Until the Supreme Court resolves this split in legal authority, the Court must apply the Second Circuit's decision which "conclude[d] that due process challenges to prolonged detention under section 1226(c) should also be reviewed under *Mathews*." *Black*, 103 F.4th at 147.  The question that inevitably follows then is: when does detention become "prolonged?"

In *Zadvydas v. Davis*, 533 U.S. 678, 701 (2001), "the Supreme Court recognized a 'presumptively reasonable period of detention' of 'six months[.]'" *Black*, 103 F.4th at 150.  The Supreme Court "required that beyond this period, if 'there is no significant likelihood of removal in the reasonably foreseeable future, the Government . . . [must] respond with evidence sufficient to rebut that showing' to justify continued detention." *Id*. (citation omitted).  "This was the closest the Court has come to adopting a bright-line rule." *Id.*

Here, Petitioner was detained on October 25, 2025.  *See* Dkt. No. 5-1 at ¶ 9.  As of the date of this decision, there are mere days before reaching the six-month mark.  During the hearing, counsel for Respondents acknowledged the impracticability of this Court denying the

15

Petition as premature only for Petitioner to refile it a few days later.  Counsel also conceded that if the Court applied the Second Circuit's decision in *Black*, as the Court is required to do, then Petitioner's referral to the *J.O.P.* class action and his pending immigration applications are an impediment to his removal.

Therefore, because "courts hearing due process challenges to prolonged section 1226(c) detention should apply the *Mathews* framework to determine, case by case, whether and when due process requires that a particular detained noncitizen receive a bond hearing," *Black*, 103 F.4th at 150-51, and it does not appear that Petitioner's removal is significantly likely to occur in the reasonably foreseeable future, the Court turns to the *Mathews* framework.

**B.      Due Process Analysis**

The Second Circuit has outlined the *Mathews* factors as follows:

(1) "the private interest that will be affected by the official action";

(2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and

(3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Black*, 103 F.4th at 151 (quoting *Mathews*, 424 U.S. at 335) (spacing added).  The Court will address each factor, in turn.

*1.  Private Interest*

Thousands of cases such as this have been brought across the country in recent months and it has been consistently held that a "[p]etitioner's interest in being free from imprisonment is the most significant liberty interest there is, . . . and it cannot be abridged without adequate procedural protections[.]"  *Gaspar v. Akshar*, No. 9:26-CV-00118, 2026 WL 699369, *8

16

(N.D.N.Y. Feb. 17, 2026) (citations and quotation marks omitted); *see, e.g.*, *Walizada v. Trump*, No. 2:25-CV-00768, 2025 WL 3551972, *18 (D. Vt. Dec. 11, 2025); *Acuna-Polanco v. Blanche*, No. 26-CV-2177, 2026 WL 1045414, *3 (E.D.N.Y. Apr. 17, 2026); *Parra v. Favro*, No. 9:26-CV-00363, 2026 WL 1030870, *6 (N.D.N.Y. Apr. 16, 2026); *Hassan v. Bondi*, No. 9:26-CV-00319, 2026 WL 891602, *4 (N.D.N.Y. Apr. 1, 2026).

Petitioner came into this country at seventeen years old.  He was adjudicated an Unaccompanied Alien Child and released to the custody of his mother.  As of the date of this decision, he is nineteen years old.  He has a pending Special Immigrant Juvenile application, a pending appeal of the denial of his asylum claim, and his asylum claim has been referred to USCIS for independent review as part of the *J.O.P.* class settlement.  Petitioner was ordered to be removed to a country he has never been to and has zero ties.  Neither party provided the Court with a substantive explanation as to why Petitioner's asylum application was pretermitted or why he was ordered removed to Honduras.  Additionally, although Petitioner was arrested for committing three separate petit larcenies, he has not been arraigned on those charges, and he remains innocent until proven guilty.  Thus, the Court finds the first *Mathews* factor weighs strongly in Petitioner's favor.

### 2. *Risk of Erroneous Deprivation*

"[D]etention in the immigration context 'has two regulatory goals: ensuring the appearance of [noncitizens] at future immigration proceedings and preventing danger to the community.'" *Rashid v. Trump*, 807 F. Supp. 3d 349, 369 (D. Vt. 2025) (quoting *Zadvydas*, 533 U.S. at 690). "'[T]he issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention.'" *M.P.L. v. Arteta*, No. 25-CV-5307, 2025 WL

3288354, *8 (S.D.N.Y. Nov. 25, 2025) (quoting *Valdez v. Joyce*, No. 25-CV-4627, 2025 WL 1707737, *3 (S.D.N.Y. June 18, 2025)).

Here, like in other cases, "Respondents did not provide [Petitioner] with any notice or any opportunity to be heard before a DHS officer or immigration judge before ICE detained him." *Minarcaja Concha v. Lyons*, No. 2:25-CV-6695, 2026 WL 215417, *17 (E.D.N.Y. Jan. 28, 2026); *see also Iza by Iza v. Larocco*, No. 2:25-CV-6915, 2026 WL 31378, *14 (E.D.N.Y. Jan. 5, 2026); *Hassan*, 2026 WL 891602, at *5; *Aguiar Olivares v. ICE Custodian*, No. 9:26-CV-203, 2026 WL 686090, *8 (N.D.N.Y. Mar. 11, 2026); *Gaspar*, 2026 WL 699369, at *8.

The Second Circuit has "remarked with concern . . . [that §] 1226(c)'s broad reach means that many noncitizens are detained 'who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them.'" *Black*, 103 F.4th at 152 (citation omitted).  In *Black*, the Second Circuit concluded that "the almost nonexistent procedural protections in place for section 1226(c) detainees markedly increased the risk of an erroneous deprivation of [the p]etitioners' private liberty interests." *Id.*

Here, there is no indication in the record that Petitioner was afforded a hearing regarding his asylum application.  There is no indication he has been arraigned on the criminal charges.  It is undisputed that he has not been afforded a bond hearing.  "The Supreme Court long ago held that the Fifth Amendment entitles noncitizens to due process in removal proceedings." *Black*, 103 F.4th at 143 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  Because Petitioner has not been afforded an opportunity to be heard, the risk of erroneous deprivation is high and weighs in Petitioner's favor.

18

### 3. *Government Interest*

"[T]he Attorney General's discretion to detain individuals under 8 U.S.C. § 1226(a) is valid where it advances a legitimate governmental purpose, and that [t]he Government has interests in ensuring the appearance of aliens at future immigration proceedings and preventing danger to the community." *Gaspar*, 2026 WL 699369, at *8 (quoting *Valdez v. Joyce*, 803 F. Supp. 3d 213, 218 (S.D.N.Y. 2025)) (additional citations and quotation marks omitted).

However, "[a]s in *Black*, 'the additional procedural safeguards [the court] would allow here under *Mathews* do nothing to undercut those interests.'" *Rashid*, 807 F. Supp. 3d at 371 (quoting *Black*, 103 F.4th at 153). "At a bond hearing before an immigration judge, that judge would assess [Petitioner's] flight risk and dangerousness on an individualized basis, just as immigration judges routinely do in other cases." *Id.* "'And while the government's legitimate interests justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need.'" *Id.* (quoting *Black*, 103 F.4th at 154. "In fact, '[t]o require that the Government justify continued detention 'promotes the Government's interest—one [the court] believe[s] to be paramount—in minimizing the enormous impact of incarceration in cases where it serves no purpose.'" *Id.* (quoting *Black*, 103 F.4th at 154).

"'[T]he Department of Justice reported an average cost of detaining noncitizens, in 2019, of $88.19 per prisoner per day. Other estimates have placed the cost as high as $134 per day.'" *M.P.L.*, 2025 WL 3288354, at *11 (quoting *Black*, 103 F.4th at 154). "'[L]imiting the use of detention to only those noncitizens who are dangerous or a flight risk may save the government, and therefore the public, from expending substantial resources on needless detention.'" *Doe v. Moniz*, 800 F. Supp. 3d 203, 217 (D. Mass. 2025) (quoting *Hernandez-Lara v. Lyons*, 10 F.4th 19,

32-33 (1st Cir. 2021)). Additionally, although "[a] criminal conviction might have some bearing on the detention calculus, [] it certainly does not by itself establish dangerousness." *O.F.C. v. Almodovar*, No. 25-CV-9816, 2026 WL 74262, *12 (S.D.N.Y. Jan. 9, 2026) (ordering a bond hearing after an immigration judge denied an application which was pending appeal and the petitioner had been detained for eleven months); *see also Vizhco Chunchi v. Francis*, No. 25-CV-10249, 2026 WL 249676, *3 (S.D.N.Y. Jan. 30, 2026) (ordering a bond hearing within seven days after the petitioner had been detained following a criminal arrest and held in custody for approximately two months); *Singh v. Noem*, No. 2:26-CV-402, 2026 WL 696835, *1 (W.D. Wash. Mar. 12, 2026) (ordering a bond hearing within ten days where the petitioner had been in custody for approximately two months after being taken into custody because of a sexual assault complaint where no formal charges were brought); *Barrios v. Raycraft*, No. 2:26-CV-10088, 2026 WL 554735, *1, *4 (E.D. Mich. Feb. 27, 2026) (granting a habeas petition and ordering a bond hearing after the petitioner had been detained for only five months).

Here, counsel for Respondents agreed during the hearing that the Government has a greater interest in detaining an individual convicted of a crime rather than one who is arrested or charged with a crime because of the presumption of innocence. Likewise, the only justification counsel provided for why Petitioner has not been given a bond hearing is because of the Government's position that § 1226(c) does not permit a bond hearing. However, as already discussed, Second Circuit precedent requires the Court to engage in a *Mathews* analysis.

Therefore, because the Government has not presented evidence to this Court which establishes that Petitioner's continued detention advances its interests in ensuring Petitioner's appearance at future immigration proceedings or prevents danger to the community, the Court finds that this factor weighs in Petitioner's favor. Based on the Court's review of the *Mathews*

framework, Petitioner is entitled to a bond hearing.[4]  However, because Petitioner does not fall within the witness protection provision of § 1226(c)(4), and *Black* does not instruct this Court that it must immediately release an individual who has been detained for nearly six months pursuant to the mandatory detention authority under § 1226(c)(1), the Court denies Petitioner's request for immediate release.[5]

### IV. CONCLUSION

**ORDERED** that the Petition for a writ of habeas corpus, Dkt. No. 1, is **GRANTED in part and DENIED in part as set forth in this decision**; and it is further

**ORDERED** that Petitioner shall be given a bond hearing within **thirty (30) days** of this decision; and it is further

**ORDERED** that Respondents shall provide the Court with a status update regarding the bond hearing no later than Friday, May 29, 2026; and it is further

**ORDERED** that the Clerk of the Court shall enter judgment in Petitioner's favor and close this case without further order of the Court at such time as the Court receives Respondents' status report and insofar as the report reflects compliance with the Court's decision; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  April 22, 2026
       Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[4] At the bond hearing, as instructed by the Second Circuit in *Black*, "the government must justify continued detention . . . ." *Black*, 103 F.4th at 157.

[5] As the Court has granted Petitioner the relief he seeks in the form of a bond hearing, the Court declines to address his alternative claim under the Administrative Procedures Act.